## McCORMICK v. HALLWOOD.

PATENTS; INTERFERENCE; REDUCTION TO PRACTICE.

In an interference involving the invention of means for preventing the overthrow of the adding wheels in a cash register, where the senior party took no testimony, but relied on his filing date, and the junior party produced drawings showing the construction of the counts in issue, and satisfactorily showed that several machines corresponding to the drawings were made and tested prior to the other party's filing date, but did not produce the machines themselves, it was *held* that the junior party had established a reduction to practice before the senior party's application was filed, and was properly awarded priority by the Commissioner.

No. 413. Patent Appeals. Submitted May 16, 1907. Decided June 4, 1907.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding. *Affirmed.*

The facts are stated in the opinion.

*Mr. Frank Parker Davis* for the appellant.

*Mr. Paul A. Staley* and *Mr. S. E. Fouts* for the appellee.

Mr. Justice McComas delivered the opinion of the Court:

The subject-matter of the issue involved in this appeal is found in the counts of this interference from eight to sixteen

inclusive, and relates to means for preventing the overthrow of the adding wheels in a cash register. These counts are as follows:

"8. The combination of a toothed wheel, a pivoted lever, a pawl on said lever for turning said wheel, an angular locking lever also carried on the pivoted lever and normally engaging the pawl to lock the same into engagement with the wheel, and means movable into contact with said locking lever after the pawl has come to rest, to release the pawl from the wheel.

"9. In a cash register of the class described, the combination, with a registering mechanism, of operating levers for the same, operating pawls mounted on said levers, locking bell cranks also mounted on said levers and each formed with an extended arm, movable tripping devices for said bell cranks adapted to contact with the extended arms no matter what positions the operating levers may have assumed.

"10. In a cash register, the combination, with a register comprising a series of wheels, of a series of levers, pawls mounted on said levers, locking devices for said pawls also mounted on said levers, an independent rock frame arranged to lock said pawls to the wheels, means connecting said frame to the movable parts of the machine, and means for connecting the locking devices to said movable parts of the machine.

"11. In a cash register, the combination, with a register comprising a series of wheels, of operating levers, pawls mounted on said levers and engaging said wheels, locking devices mounted on said levers and engaging said pawls and formed with operating extensions, and movable means independent of the levers and continuously in position for actuating said extension.

"12. In a cash register, the combination, with a register comprising a series of wheels, a series of levers, pawls mounted on said levers, locking devices for said pawls also mounted on said levers, an independent rock frame arranged to lock said pawls to the wheels and operate the locking devices, and means connecting said frame to the movable parts of the machine.

"13. In a cash register, the combination, with a registering mechanism, a series of movable members, register operating

pawls mounted on said members, an operating member connected to the movable parts of the machine, a series of movable pawl locking devices mounted on the movable members, and means for maintaining an operating connection between the operating member and the locking devices, no matter what positions the movable members may take up.

"14. In a cash register, the combination, with a series of registering wheels, of a series of pivoted levers, operating pawls mounted on said levers, a series of locking pawls mounted on said levers and having upwardly projecting curved extensions, and a relatively stationary tripping device for said curved extensions arranged to operate the same, no matter what position the pivoted levers may have assumed.

"15. In a cash register, a registering wheel, a pivoted lever, a pawl carried by said lever for turning the register wheel, an angular locking lever also carried by said pivoted lever for engaging the pawl and locking it to the register wheel, a key, and means released by the depression of said key for tripping the angular lever to free the pawl from its register wheel, substantially as described.

"16. In a cash register, a registering wheel, a pivoted lever, a pawl carried by said lever for turning the register wheel, an angular locking lever also carried by said pivoted lever and having an extended arm, means for normally holding the locking lever in engagement with the pawl to lock the same to the register wheel, and means engaging the extended arm of said angular lever to free the same from the wheel after the pawl has come to rest, substantially as described."

The adding wheels are mounted on the main shaft of the machine, on which the main and auxiliary yokes are mounted. Mounted on this shaft alternately with the adding wheels are arms which carry pawls which are by springs pressed into engagement with the ratcheted peripheries of the adding wheels and these pawls carrying arms have legs which rest on the auxiliary yokes, so that as the yokes drop the arms follow them, the pawls tripping over the teeth of the adding wheels. As the main yoke is swung upward it carries auxiliary yokes and the

arms with it, and, the pawls engaging the teeth of the adding wheels, the latter are turned so that the valves of the pressed keys are added thereon.

The counts we here consider show devices to prevent the adding wheel being carried by momentum beyond the pawls, thereby registering an amount greater than that indicated by the keys. The applications of McCormick, appellant, and of Hallwood, the appelle, alike show means consisting of a bell crank pivoted to the end of the pawl carrying arm, the shorter arm being spring pressed against the rear of the pawls; the longer arm of the bell crank projects over a rocking frame piece which is so arranged that when the main yoke moves downward it is rocked, throwing the bell crank out of engagement with the pawls, and allowing the latter to trip over the teeth of the adding wheels, but when the yoke moves upward it is rocked and allows the bell crank to be thrown against the pawls, thereby locking the adding wheels and pawl carrying arms, and preventing the adding wheels from being overthrown. It is claimed that these means prevent the overthrow of the counting wheels, which register the amount of the purchase and add it to the amount registered from previous purchases. It was conceded in argument that without some such means such an overthrow could be produced by closing the cash drawer violently, or by pounding or hammering on it.

The tribunals below fully discussed the facts. The appellant, John H. McCormick, took no testimony, relying on the date of the filing of his application as his dates of conception and reduction to practice; and this date in respect of the counts we here consider is December 30, 1897. Henry S. Hallwood is the junior party, and upon him is the burden of proof in order to prevail in this interference. He has produced no testimony to support the dates of his conception and disclosure alleged in his preliminary statement. He produces much testimony tending to show that devices embodying the subject-matter of the issue were constructed and successfully tested during the summer of 1897. The Examiner of Interferences concluded that Hallwood proved a conception of the invention in issue at that

time, but that there was such delay in making use of the invention and in applying for a patent that the alleged reduction to practice was nothing more than an abandoned experiment. The Examiners-in-Chief concluded that Hallwood has fully proven a reduction to practice, and reversed the decision of the Examiner of Interferences relating to the counts which we here consider, and awarded priority of invention to Hallwood as to counts eight to sixteen inclusive.

The Commissioner of Patents affirmed the decision of the Examiners-in-Chief, awarding priority of invention to McCormick as to counts one to seven inclusive (and with these we are not here concerned), and awarding priority of invention to Hallwood as to counts eight to sixteen inclusive. With the latter award we are concerned on this appeal.

We agree with the conclusion of the Examiners-in-Chief and of the Commissioner of Patents. It was satisfactorily shown that several machines embodying the subject-matter of the counts with which we are here concerned were made and tested by the Hallwood Company in 1897, before McCormick filed his application. It is true, no one of these machines was in evidence, but it was proved that they embodied the constructions in Hallwood's drawings number 3 and number 4, number 3 disclosing the subject-matter of some, and number 4 disclosing the subject-matter of all, of the counts we here consider.

The machine corresponding to drawing number 3 not proving satisfactory, the construction shown in drawing number 4 was substituted. The evidence of the witnesses Simpson, Vlerebome, Hill, Ward, Hildebrand, Hold, Squires, and Emory, in connection with other facts and circumstances, is convincing that a machine containing the devices corresponding to drawing number 4 and embodying the features of each count here in controversy was made, tested, and found satisfactory during the summer or early fall in 1897. Most of these witnesses were familiar with the machine to which the improvements were applied, and identified the devices, and speak intelligently of their operation. Hallwood testified that three machines embodying the invention were made and shipped to three cities he named.

Although he produced none of them, the positive testimony of his witnesses satisfactorily supplies such omission. It is true that for sometime after this successful reduction to practice Hallwood's company used an old form of interlock for the register, but it is also true that his company had on hand a stock of the old material, and the old interlock was sufficient for the ordinary use of the machines when not subjected to violent slamming. To say that the Hallwood company adopted the tail-piece construction does not satisfy us that the company did not continue to use old material on hand. While the construction was not adopted commercially until some months later, it was not discarded as unsatisfactory, but quite the contrary. It is true that Spangler and Huckins, witnesses called by McCormick in rebuttal, were employed by the Hallwood company at the time and might have known of such a construction, and both say they were ignorant of it. And it is notably true that Spangler's special employment and the experimental work in which he was engaged ought to have made it impossible for Hallwood's improved machine to have escaped Spangler's familiar acquaintance with it. The witnesses for Hallwood, however, so strongly confirm Hallwood that Spangler and Huckins are overborne. But on the other hand, Hill, Ward, and Emory during the same period tested these very devices, and testified that they operated satisfactorily. We concur with the Examiners-in-Chief and the Commissioner of Patents in holding that Hallwood reduced to practice the construction of counts eight to sixteen inclusive, before McCormick's application was filed, and that therefore Hallwood was properly awarded priority as the inventor in respect of these counts. All of the tribunals agreed that Hallwood was the first to conceive, and it is clear he did not abandon his invention.

The decision of the Commissioner of Patents is affirmed, and the clerk of this court will certify this opinion and decision to the Commissioner of Patents in the manner required by law.                                    *Affirmed.*